UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JALEANA STEVENSON | * | CIVIL ACTION NO. 17-6003 |
| | * | |
| | * | DIVISION:  1 |
| VERSUS | * | |
| | * | MAGISTRATE JUDGE |
| DELTA AIRLINES, INC. | * | JANIS VAN MEERVELD |
| | * | |
| ********************************* | * | |

ORDER AND REASONS

Before the Court is the Motion for Reconsideration filed by plaintiff Jaleana Stevenson

(Rec. Doc. 62) and the Motion to Strike certain evidence submitted by plaintiff in connection

therewith (Rec. Doc. 65). For the following reasons, the Motion for Reconsideration is DENIED

and the Motion to Strike is DENIED as moot.

Background

Plaintiff Jaleana Stevenson was employed by Delta Airlines, Inc. ("Delta") from February

27, 2007 until June 19, 2013, when she sent an email to Delta stating her decision to resign. She

had begun working as a ticket agent and was eventually promoted to the position of "Red Coat."

In this lawsuit, she alleges that she was diagnosed with shingles in March 2012 and, as a result,

she called in sick. When a co-worker texted her within the following week to see if she was "alright

because she heard Plaintiff had shingles," Ms. Stevenson alleged that she wrote a letter to her

station manager protesting the disclosure of her personal information to co-workers without her

knowledge or approval. Ms. Stevenson returned from sick leave in August 2012.

In September 2012, she applied for a flight attendant position. Prior to doing so, she alleges that she checked her personnel file and found that it was empty. Ms. Stevenson was turned down for in-flight service. When she re-checked her personnel file, she found "several unknown writeups" added by Kyla Singleton. Ms. Stevenson alleges that she was written up in October 2012 by Steve Washington for "mismanaging her personal relationships." Ms. Stevenson believes this was in retaliation for writing a letter protesting the disclosure of her personal information.

Ms. Stevenson alleges that in February 2013, while in a meeting with Ms. Singleton and another employee concerning a disciplinary infraction by the other employee, the other employee threatened to punch Ms. Stevenson in the face, but no action was taken against the employee. Ms. Stevenson alleges that she filed a police report "to ensure her safety at work."

Ms. Stevenson alleges that her shingles returned and that on February 15, 2013, she sought help from Dr. Mimi Jalenka. She alleges that another physician, Dr. Baig, "wrote Plaintiff out for two weeks with Shingles." She alleges she was demoted from her position as Red Coat on March 2, 2013. She asserts she was constructively discharged on June 19, 2013.

The record reflects that on May 21, 2014, she filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") asserting discrimination against her on the basis of race, disability, and retaliation. Therein, she asserted that on March 2, 2013, she had been demoted and on June 19, 2013, she had been constructively discharged. On March 31, 2016, the EEOC issued a determination that it was "unable to conclude that the information obtained establishes violations of the statutes."

Ms. Stevenson filed the present lawsuit on July 1, 2016, in the United States District Court for the District of Columbia. She alleged claims for unlawful race discrimination, retaliation, and hostile work environment under Title VII of the Civil Rights Act, discrimination under the

Americans with Disabilities Act ("ADA"), and violation of the Family Medical Leave Act ("FMLA"). On May 5, 2016, the court in the District of Columbia dismissed Ms. Stevenson's retaliation, hostile work environment,[1] and FMLA claims and transferred the remaining claims to this district.

The parties consented to proceed before the undersigned magistrate judge. Following discovery, Delta moved for summary judgment arguing that Ms. Stevenson's race discrimination claim fails as a matter of law because she cannot prove that she suffered an adverse employment action because of her race, because she failed to establish working conditions sufficiently intolerable to support a claim of constructive discharge, because Delta has articulated a legitimate, non-discriminatory reason for why Ms. Stevenson did not work some days during 2013 and for her demotion, and because her claims are untimely. On November 13, 2018, the court granted summary judgment on the grounds that Ms. Stevenson's claim was untimely because she had not filed her EEOC charge until more than 300 days after the occurrence of any of the alleged unlawful employment practices. The court noted that Ms. Stevenson had not addressed the untimeliness issue in her opposition to the motion for summary judgment. Having found the claim untimely, the court did not address the remaining arguments favoring dismissal.

On December 11, 2018, Ms. Stevenson filed the present motion for reconsideration. For the first time, she argues that her claim was timely because she sought administrative relief from the EEOC within 300 days of Delta's adverse employment actions and that the EEOC mislead Ms. Stevenson regarding her complaint. Ms. Stevenson attaches an "Affidavit," unnotarized but made under penalty of perjury, in which she asserts that on some unspecified date, she went to the EEOC

---

[1] Although the court's May 5, 2017, Order (Rec. Doc. 15), does not reference dismissal of Ms. Stevenson's hostile work environment claims, the court's May 5, 2017, Memorandum Opinion "dismisses Plaintiff's retaliation and hostile work environment claims under Title VII." (Rec. Doc. 14).

to file a charge of discrimination against Delta and was given a form to fill out and fax back. (Rec. Doc. 62-3). She asserts that on December 26, 2013, she faxed the form back to the EEOC. She attaches the EEOC Questionnaire that she says she faxed. (Rec. Doc. 62-5). There is no fax confirmation sheet or evidence of faxing. The form explains that the person must file a charge of job discrimination within 300 days from the day she knew about the discrimination and that if she does not do so, she will lose her rights. It explains that she can check Box 1 to indicate that she wants to talk to an EEOC employee before deciding to file a charge, or she can check Box 2 to indicate that she wants to file a charge of discrimination and authorizes the EEOC to look into the discrimination she describes. Ms. Stevenson checked neither Box 1 nor Box 2.

Ms. Stevenson asserts that she called her attorney Charlene Hardnett at some unspecified time to tell her she had faxed in the form and was told that she should confirm the EEOC received her form. She attaches the affidavit of Ms. Hardnett, who confirms that assertion. (Rec. Doc. 62-4). Ms. Stevenson asserts that she called the EEOC on January 7, 2014 concerning the status of a "complaint filed previously on March 18, 2013[2] against Delta." She says she spoke to Mildred Johnson who informed Ms. Stevenson that she had not checked a particular box on the intake questionnaire to pursue her claim and that it was too late to file charges. She says she asked if she could speak to someone to override the decision to dismiss her charges and was told she could speak to supervisor Yuma Kandan on January 14, 2014. She does not assert that she spoke to Ms. Kandan on January 14, 2014.

---

[2] This is the first reference to a complaint filed on March 18, 2013. No evidence has been presented to show that an EEOC charge was filed on March 18, 2013. In her affidavit, Ms. Hardnett asserts that Ms. Stevenson called her on January 10, 2014 regarding her conversation with Ms. Johnson "about her charge that was filed in March 2013." Ms. Hardnett says she informed Ms. Stevenson "that the date of the incident(s) were in March 2013, but the charge date is different." This suggests that Ms. Stevenson may have confused the date of the incident with the date she filed the charge. Alternatively, if Ms. Stevenson is correct in her Affidavit (Declaration) (Rec. Doc. 62-3) and in her letter to President Obama (Rec. Doc. 62-6) and she did go to the EEOC on March 18, 2013 to file a charge against Delta, then she inexplicably waited over nine months to return the Intake Questionnaire she was given, which she allegedly faxed to the EEOC on December 26, 2013.

Instead, she asserts that at some unspecified time, she called Ms. Johnson and notified her that under her March 18, 2013, claim, she was still within her 300-day limit. She says that Ms. Johnson agreed to file the charges. In her affidavit, Ms. Hardnett says that on January 16, 2014, Ms. Stevenson told her that Ms. Johnson recalculated the dates and determined that the March 2, 2013 incident was outside of the 300-day period but the March 18, 2013, incident[3] was within the 300 days. Ms. Hardnett also states that Ms. Stevenson told her that the EEOC would process her charge. Ms. Hardnett states that around the same time, Ms. Stevenson told her that she sent a letter of complaint to President Obama and the Department of Justice. Ms. Hardnett said she did not receive a copy of the letter until the lawsuit was dismissed in 2018. Ms. Stevenson, for her part, asserts that she sent certified letters to the EEOC office, the President, and the Department of Justice expressing her concerns in October 2014. A copy of the letter to then President Obama is attached, indicating a carbon copy to the Department of Justice and the EEOC. (Rec. Doc. 62-6). It is dated January 10, 2014, references a "complaint previously filed on March 18, 2013," and describes her discussions with Ms. Johnson on January 7, 2014 and an unspecified time thereafter. Other than a tracking number listed at the bottom, there is no evidence that the letter was sent by certified mail.

The one charge verified to have been filed with the EEOC is Charge Number 461-2014-00477, signed by Ms. Stevenson on May 21, 2014, and stamped "Received" on June 5, 2014. (Rec.

---

[3] Plaintiff's 12-page, multi-count complaint is silent as to any events occurring on March 18, 2013. (Rec. Doc. 1). So is her Opposition to defendant's Motion for Summary Judgment. (Rec. Doc. 55). So is her Memorandum in Support of Motion for New Trial and Motion for Reconsideration. (Rec. Doc. 62-1). The court notes, however, that the Intake Questionnaire allegedly faxed to the EEOC on December 26, 2013, states that on March 18, 2013, Mr. Washington "informed me that I could not return to work due to medication I was on. He stated I was a hazard to myself and the passengers." (Rec. Doc. 62-5, at 2, 5). This allegation is repeated without a date in the May 21, 2014 EEOC charge. (Rec. Doc. 62-7). Other than this reference in the Intake Questionnaire, the summary judgment evidence shows that the only thing that occurred on March 18, 2013, was that Ms. Stevenson's physician wrote her a note excusing her from work for 30 days due to drowsiness from shingles medication. (Stevenson Depo., Rec. Doc. 50-3, at 87; Depo. Ex. 26, Rec. Doc. 50-4, at 112).

Doc. 62-7, at 2). Notably, Ms. Stevenson fails to mention this Charge at all in her Affidavit. Nor does Ms. Hardnett. However, in her Motion for New Trial, Ms. Stevenson claims that "[a]fter not receiving a response from the EEOC for more than four months, Ms. Stevenson filed a second complaint against Delta on May 21, 2014." (Rec. Doc. 62-1, at 2). The "complaint" (actually a Charge of Discrimination) conspicuously does not mention any allegedly earlier filed Charge. (Rec. Doc. 62-7, at 2). Additionally, while her Complaint filed with the United States District Court for the District of Columbia alleges "Plaintiff was not given proper intake assistance by the EEOC office in New Orleans," she highlights specifically that the resulting omission was that "Hostile work environment was not included in her charge," **not** that an earlier charge had been filed and gone missing. (Rec. Doc. 1, at 2).

Along with its opposition to the motion for reconsideration, Delta has moved to strike some of the evidence submitted by Ms. Stevenson. Delta complains that Ms. Stevenson's "affidavit" is not notarized. However, that document includes a declaration under penalty of perjury and is not excludable simply because it is not notarized. <u>See</u> 28 U.S.C. §1746. Delta also argues that Ms. Stevenson's opposition to the motion to strike was untimely and should be stricken, that none of the evidence Ms. Stevenson has submitted should be considered because she has presented no explanation for failing to submit it earlier, that the Stevenson "affidavit" contains inadmissible hearsay, and that the Obama letter and questionnaire contain inadmissible hearsay and have not been properly authenticated. The court does not address these arguments, because, as discussed below, even accepting this evidence into the record, Ms. Stevenson's motion for reconsideration must be denied.

<u>Law and Analysis</u>

1.  *Motion for Reconsideration*

    a.  *Standard*

"The Federal Rules of Civil Procedure do not provide for a 'Motion for Reconsideration' but such motions may properly be considered either a Rule 59(e) motion to alter or amend judgment or a Rule 60(b) motion for relief from judgment." <u>Hamilton Plaintiffs v. Williams Plaintiffs</u>, 147 F.3d 367, 371 n. 10 (5th Cir. 1998). If filed within the time period required by Rule 59(e), the motion for reconsideration is considered under that rule. <u>See</u> <u>id.</u>; <u>Shimon v. Sewage & Water Bd. of New Orleans</u>, No. CIV.A. 05-1392, 2007 WL 101038, at *1 (E.D. La. Jan. 9, 2007). A Rule 59(e) "motion to alter or amend judgment must be filed no later than 28 days after the entry of the judgment." Fed. R. Civ. Proc. 59(e). Plaintiff here has filed her motion for reconsideration within 28 days of the judgment and, accordingly, Rule 59(e) applies.

"A party may bring a motion under [Rule 59(e)] on three possible grounds: (1) an intervening change in controlling law; (2) the availability of new evidence not previously available; or (3) the need to correct a clear error of law or prevent manifest injustice." <u>Meyers Warehouse, Inc. v. Canal Ins. Co.</u>, No. CIV.A. 12-2948, 2014 WL 5113323, at *2 (E.D. La. Oct. 10, 2014), <u>aff'd sub nom.</u> <u>Meyers Warehouse, Inc. v. Canal Indem. Co.</u>, 614 F. App'x 719 (5th Cir. 2015); <u>Shimon v. Sewage & Water Bd. of New Orleans</u>, No. CIV.A. 05-1392, 2007 WL 101038, at *1 (E.D. La. Jan. 9, 2007). "[A] motion to alter or amend the judgment under Rule 59(e) . . . cannot be used to raise arguments which could, and should, have been made before the judgment issued.'" <u>Rosenblatt v. United Way of Greater Houston</u>, 607 F.3d 413, 419 (5th Cir. 2010) (quoting <u>Rosenzweig v. Azurix Corp.</u>, 332 F.3d 854, 863 (5th Cir. 2003)) (alteration in original).

Reconsidering a judgment is extraordinary, and the court "must balance between two competing interests: the desire to achieve and maintain a final judgment and the desire to reach a just decision based upon the evidence." <u>Shimon</u>, 2007 WL 101038, at *2. "[I]n striking the proper balance in these circumstances, the court should consider, among other things, (1) the reasons for the plaintiffs' default, (2) the importance of the evidence to the plaintiffs' case, (3) whether the evidence was available to plaintiffs before they responded to the summary judgment motion, and (4) the likelihood that the defendants will suffer unfair prejudice if the case is reopened." <u>Ford v. Elsbury</u>, 32 F.3d 931, 937–38 (5th Cir. 1994). But the court notes that the mover is not required to "first show that her default was the result of mistake, inadvertence, surprise, or excusable neglect or that the evidence is such as to show that the judgment was manifestly wrong." <u>Id.</u> at 937 (5th Cir. 1994) (quoting <u>Lavespere v. Niagara Mach. & Tool Works, Inc.</u>, 910 F.2d 167, 174 (5th Cir. 1990), <u>abrogated on other grounds by</u> <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069 (5th Cir. 1994)).

    b.  *Analysis*

Ms. Stevenson's Motion for Reconsideration is predicated on additional evidence that was not before the Court at the time it decided the Motion for Summary Judgment. She does not appear to contend that the evidence is newly discovered; she presumably argues that the motion for summary judgment should be reconsidered to prevent manifest injustice. The court turns to the factors considered when determining whether to grant a motion for reconsideration.

Ms. Stevenson submits that the reason she failed to submit these documents earlier is because Delta waived any objections to the timeliness of Ms. Stevenson's EEOC complaint by appearing, answering, transferring venue, and participating in discovery. <u>See</u> <u>Hull v. Emerson Motors/Nidec</u>, 532 F. App'x 586, 588 (5th Cir. 2013) (quoting <u>Taylor v. United Parcel Serv., Inc.</u>, 554 F.3d 510, 521 (5th Cir. 2008)) ("Filing a timely charge of discrimination with the EEOC is

not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.").

Delta opposes this explanation, first pointing out that a plaintiff's failure to exhaust administrative remedies operates as a jurisdictional bar. Filer v. Donley, 690 F.3d 643, 648 (5th Cir. 2012) ("The court correctly held that it lacked jurisdiction to consider the other allegations as to which Filer failed to exhaust his administrative remedies."). Moreover, Delta submits that it has not waived its defenses concerning Ms. Stevenson's failure to timely exhaust her administrative remedies. In its answer, it denied Ms. Stevenson's allegation that she had timely filed a charge of discrimination against it with the EEOC. It also raised the statute of limitations and failure to exhaust administrative remedies as defenses. Further, Delta argues that Ms. Stevenson herself waived any right to assert waiver because she failed to urge this argument in opposition to Delta's motion for summary judgment. See Knudsen v. Bd. of Sup'rs of Univ. of Louisiana Sys., No. CIV.A. 14-382, 2015 WL 1757695, at *1 (E.D. La. Apr. 16, 2015) ("A party's failure to brief an argument in response to a summary judgment motion waives that argument.").

The court finds that the reasons for Ms. Stevenson's failure to argue her theory of waiver and present evidence purporting to show timeliness weigh against granting the motion for reconsideration. Ms. Stevenson fails to explain why she completely failed to address Delta's timeliness argument in opposing Delta's motion for summary judgment. If she was taking the position that Delta had waived the timeliness argument, she does not explain why she failed to make that argument earlier. At best, it appears that her failure to address Delta's timeliness argument is a result of inadvertence or a mistaken assumption that her waiver argument was so obvious from the face of the pleadings that she did not need to address it.

The court next considers the importance of the evidence to Ms. Stevenson's case. The new evidence purports to show that Ms. Stevenson submitted an EEOC intake questionnaire on December 26, 2013, and that on January 16, 2014, Ms. Stevenson communicated to the EEOC that she wanted to file a Charge of Discrimination and was told that the EEOC had done so. Ms. Stevenson points out that an intake questionnaire can be sufficient to constitute a charge. Richard v. St. Tammany Par. Sheriff's Dep't, No. CV 17-9703, 2018 WL 2065594, at *4 (E.D. La. May 3, 2018); see Fed. Exp. Corp. v. Holowecki, 552 U.S. 389, 405–06(2008) (finding a completed intake questionnaire sufficient to constitute a charge where the employee checked a box on the form giving the EEOC permission to disclose her identity to the employer and where she attached a detailed affidavit requesting that the EEOC force the employer to stop discriminating against her). In Richard, the plaintiff timely submitted an intake questionnaire but did not file a formal charge until past the 300-day requirement. 2018 WL 2065594, at *4. The court found the intake questionnaire was sufficient to constitute a charge where the plaintiff identified the parties, alleged the grounds for the charge, checked a box giving consent for the agency to look into his discrimination claims and disclose his identity to his employer, confirmed that he intended to file a charge of discrimination, and was accompanied by a three-page statement. Id. In ruling, the court noted that the EEOC had not denied the charge as untimely. Id. at *5.

Unlike in the Richard case, though, on the December 26, 2013, intake questionnaire, Ms. Stevenson did not check the box authorizing the EEOC to look into the discrimination and consenting to have her identity disclosed to her employer. As evidence of her intent to file a charge of discrimination, she relies on two purported conversations with the EEOC in January 2014. During the first, she says she discussed "a complaint filed previously on March 18, 2013" and that she was told it was too late to file formal charges. On some unspecified date thereafter, she says

she again contacted the EEOC and notified the field officer that "under the file claimed on March 18th" she was within the 300-day limit and that the field officer said she would file the charges. Ms. Stevenson has not cited a case where a verbal conversation regarding the filing of a charge would be sufficient to constitute a charge of discrimination where the intake form did not indicate an intent to do so.

Ms. Stevenson also argues that equitable tolling applies because the EEOC misrepresented to her in January 2014 that a charge would be filed. See Granger v. Aaron's, Inc., 636 F.3d 708, 712 (5th Cir. 2011) (noting the following bases for equitable tolling: "(1) the pendency of a suit between the same parties in the wrong forum; (2) plaintiff's unawareness of the facts giving rise to the claim because of the defendant's intentional concealment of them; and (3) the EEOC's misleading the plaintiff about the nature of her rights").

Delta submits that Ms. Stevenson has failed to establish that she actually filed or faxed the December 26, 2013, intake forms because she has not included a fax confirmation page or any evidence from the EEOC verifying receipt. It argues that Richard and Holowecki are inapplicable here because Ms. Stevenson did not include a request for the EEOC to investigate along with her intake questionnaire. Delta does not address whether the telephone conversation in January 2014 could show that Ms. Stevenson had requested the EEOC take action.

Delta argues that equitable tolling is inapplicable here because this case does not present extreme circumstances warranting such relief. It points out that after the purported phone call on January 16, 2014, Ms. Stevenson took no other affirmative steps to pursue her claim, nor did she seek confirmation of her filing. For example, in the Granger equitable tolling case cited by Ms. Stevenson, the plaintiffs' attorneys had timely sent in the charge of discrimination, but had sent it to the Office of Federal Contract Compliance Programs ("OFCCP") instead of the EEOC. 636

F.3d at 713. Thereafter, the attorney's staff made repeated contact with the OFCCP and were never told of their error and were instead told that the claim was being investigated. Id. When the OFCCP finally determined that the employer was not a federal contractor, it transferred the complaints to the EEOC and the EEOC assured the plaintiffs their complaints would be treated as timely. Id. at 710. The court of appeals found that "[i]n light of their actions, the government's considerable errors and neglect, and the lack of demonstrated prejudice to [the employer], this case presents sufficiently rare circumstances (we trust) to support the district court's application of equitable tolling." Id. at 713.

Delta also cites Hull v. Emerson Motors/Nidec, where the Fifth Circuit affirmed the district court's decision on summary judgment that plaintiff was not entitled to proceed on the basis of equitable tolling. 532 F. App'x 586, 589 (5th Cir. 2013) (unpublished). The plaintiff had filed an intake questionnaire within the required time period following the alleged discrimination, noting his intent to file a charge, but he did not file a charge. Id. at 587. The EEOC found it was unlikely that plaintiff had a valid claim and declined to pursue the matter. Id. When plaintiff filed a charge after his deadline to do so, the EEOC declined to pursue it finding again that a violation of Title VII was unlikely and also that the claim was untimely. Id. Plaintiff alleged before the court that he had been misled about his rights and was diligent in filling out the intake questionnaire. Id. at 588. The court found the circumstances were not exceptional and did not demand tolling, noting that there was no evidence that the EEOC had misled the plaintiff or made an affirmative representation and noting that he took no further steps (like timely filing a charge or checking to see whether a charge had been filed) following the filing of his intake questionnaire until he untimely filed a charge of discrimination. Id.

Assuming that the intake form was actually submitted on December 26, 2013, it is insufficient to constitute the filing of a charge of discrimination because unlike the plaintiff in Richard, Ms. Stevenson did not check the box indicating her intent to file a charge or authorizing the EEOC to file her claim. The court is also unconvinced that the circumstances here are exceptional enough to justify equitable tolling, even if Ms. Stevenson's declaration about the January 2014 telephone calls with the EEOC is to be believed. Nonetheless, the evidence submitted might have created a fact issue precluding summary judgment. Accordingly, the court finds the new evidence is of some importance to her claim. This factor might weigh in favor of reconsideration. However, as further discussed below, even if Ms. Stevenson's claim was timely, it still cannot survive summary judgment on the merits.

The court next considers whether the evidence was available to Ms. Stevenson before she responded to the summary judgment motion. There is no dispute that the evidence was available, and as discussed above, she has provided no reasonable explanation for why she failed to present it earlier.

Finally, the court considers the likelihood that the defendants would suffer unfair prejudice if the case is reopened. Defendants make no argument that they would be prejudiced by the reconsideration of the court's judgment. This factor weighs in favor of granting the motion for reconsideration.

On balance, the court finds the factors overwhelmingly weigh against granting the motion for reconsideration. Importantly, there is no doubt that the evidence was previously available to Ms. Stevenson and she has not provided any reasonable explanation for her failure to even address Delta's argument in its motion for summary judgment. It must be noted that much of the evidence is of highly dubious validity—an allegedly earlier filed EEOC Charge of which there is no record

and which plaintiff herself did not mention for years; self-serving alleged discussions with the EEOC which are completely unsupported by any documentation; an allegedly faxed Intake Questionnaire for which no proof of faxing was provided, such as a confirmation page, etc. The authenticity of the letter to President Obama is suspect for a number of reasons. It is dated January 10, 2014. Yet it references discussions Ms. Stevenson allegedly had with Ms. Johnson of the EEOC on January 7, 2014, a mere three days before the letter. Furthermore, the letter references that Ms. Johnson instructed Ms. Stevenson to call her EEOC supervisor on January 14, 2014. Did Ms. Stevenson not even wait to speak to the supervisor on January 14 before sending this letter to President Obama? The letter further references without date that "subsequently,"[4] Ms. Stevenson again spoke to Ms. Johnson at which time Ms. Johnson allegedly "agreed she would file the charges." (Rec. Doc. 62-6). How did this "subsequent" discussion happen before Ms. Stevenson wrote to President Obama on January 10, 2014, such that she could include a discussion of it to the President? Finally, according to her Affidavit, despite the January 10, 2014 date on the exhibit, Ms. Stevenson claims she mailed this letter certified mail to both the President and the Department of Justice "in October 2014." Id.

Additionally, regardless of its dubious validity, the supplemental evidence itself is of no importance because the intake form does not qualify as a charge and the facts she now alleges do not rise to the exceptional level for equitable tolling to apply. Further, as the court addresses below, even if the evidence were considered now and the court could find that Ms. Stevenson's claim is timely, her claims cannot survive summary judgment on the merits.

---

[4] Ms. Stevenson's brief claims this subsequent discussion was on January 16, 2014, six days after the letter to President Obama referencing the contents of that discussion. (Rec. Doc. 62-1, at 4). The chronology simply is not possible.

*2. Summary Judgement Standard*

Summary judgment under Federal Rule of Civil Procedure 56 must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56. The movant has the initial burden of "showing the absence of a genuine issue as to any material fact." Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). The respondent must then "produce evidence or designate specific facts showing the existence of a genuine issue for trial." Engstrom v. First Nat. Bank of Eagle Lake, 47 F.3d 1459, 1462 (5th Cir. 1995). Evidence that is "merely colorable" or "is not significantly probative" is not sufficient to defeat summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

"An issue is material if its resolution could affect the outcome of the action." Daniels v. City of Arlington, Tex., 246 F.3d 500, 502 (5th Cir. 2001). Thus, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. Although this Court must "resolve factual controversies in favor of the nonmoving party," it must only do so "where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013) (quoting Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005). The Court must not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).

"Summary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant." Armstrong v. City of Dallas, 997 F.2d 62, 67 (5th Cir. 1993). Summary judgment is also appropriate if the party opposing the

motion fails to establish an essential element of his case. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

   *a. Material Facts*

Ms. Stevenson began working for Delta as a customer service agent on February 27, 2007 at the Louis Armstrong International Airport in New Orleans. Delta promoted Ms. Stevenson to the passenger service agent position known as "Red Coat" on March 16, 2010. As a Red Coat, Ms. Stevenson oversaw the work of the customer service agents, resolved conflicts, and addressed customer service related issues. As a Red Coat, Ms. Stevenson was supervised by Kyla Singleton and Chris Cristina, both performance leaders. She also reported to Stephen "Steve" Washington, the station manager.

On October 24, 2008, Ms. Stevenson received a Warning Letter for an unsatisfactory attendance record. The letter required Ms. Stevenson to submit a doctor's certification for each absence due to illness for a period of six months.  On February 17, 2009, a Probationary Letter was issued to Ms. Stevenson citing five examples of absences since the October 2008 letter and stating that Ms. Stevenson was "not meeting Delta's standards in the area of attendance and dependability." She was placed on a probationary period of at least six months during which salary increases and promotions would not be possible. She was again required to submit a doctor's certification for any absences due to illness or injury.

According to Ms. Stevenson, on December 26, 2010, co-workers verbally attacked her. She cites an email dated December 28, 2010, describing the incident to her station manager at the time, Glynda Pace, with a carbon copy to Kyla Singleton. (Rec. Doc. 55-2, at 10-11). She reported that she felt like "I am consistently under attack and some individuals may be conspiring against

me." Id. The email does not mention race or indicate that Ms. Stevenson believed the verbal altercation with her co-workers was racially motivated.

On December 28, 2010, Ms. Stevenson says her supervisor Chris Cristina threatened and intimidated her. She cites an email dated December 29, 2010, in which she reported the incident to Pace. She stated that Mr. Cristina came and stood behind her while she was typing an email in the office; he asked what she was doing, and then he stated that "this has to stop," "this thing with you and you know who," and that Ms. Stevenson "can't go around threatening people." (Rec. Doc. 55-2, at 12). She reported that she felt threatened by Mr. Cristina's actions. Id.

On January 30, 2011, Ms. Stevenson reported an incident that had occurred on January 27, 2011, to Ms. Pace with a copy to Ms. Singleton. (Rec. Doc. 55-2, at 13). Ms. Stevenson said that a co-worker had snatched her clipboard from her hands. Ms. Pace responded "you are a leader, advise [the co-worker] you'd like to speak to him and professionally tell him how that made you feel. IF you still need someone to talk to [him] afterwards, let us know." Id. Ms. Stevenson's email did not mention race or state that she believed the incident was racially motivated. In her statement of material facts, Ms. Stevenson asserts that the co-worker was Caucasian.

In February 2012, Ms. Stevenson was diagnosed with shingles. According to Ms. Stevenson's testimony, the condition prevented her from working because it was contagious at first, and then she suffered from nerve pain. (Rec. Doc. 50-3, at 12-14). As she was provided with return-to-work dates by her doctors, she would provide those directly to Sedgwick, a third-party company that administers short-term disability for Delta. Id. at 16. She took off work for six months and received short term disability benefits during that period. Id. at 17.

On or about February 10, 2013, there was a verbal altercation between Ms. Stevenson and her co-worker Altonvice Louding. (Stevenson Depo., Rec. Doc. 503, at 30). Ms. Louding and a

few other people left the ticket counter where Ms. Stevenson was working as a Red Coat ticket counter agent. Id. Ms. Stevenson called the gate and spoke to Ms. Louding, informing her that someone needed to come back because they needed help at the ticket counter. Id. at 31. Ms. Louding came back to the ticket counter and confronted Ms. Stevenson while she was in front of a passenger, complaining about being shuffled back and forth. Id. Ms. Stevenson said she needed Ms. Louding at the first-class position, but Ms. Louding refused to move without cashing out first. Id. at 32. So, Ms. Stevenson accompanied Ms. Louding to the back office so she could witness the drop. Id.

Once there, Ms. Stevenson spoke to Ms. Singleton and said "[y]ou really need to talk to her, I have never seen her like this." Id. Ms. Stevenson asked to sit in on the conversation. Id. According to Ms. Stevenson, Ms. Louding reported that Ms. Stevenson spoke to her like a child. Id. Ms. Singleton spoke to Ms. Louding and instructed her to go to the position as Ms. Stevenson had instructed her. Id. at 33. After leaving the office, Ms. Stevenson and Ms. Louding had a verbal altercation in the hallway. Id. According to Ms. Stevenson, Ms. Louding "was standing in the middle of the hallway blocking the exit, mouthing off: You are nothing but an agent with a red coat on." Id. Ms. Stevenson says she told Ms. Louding "you need to go where you were told to go" several times, eventually saying "you need to be obedient and go where you were told to go." Id. According to Ms. Stevenson, when she said that, Ms. Louding "flipped out" and threatened to punch her in the face. Id. at 33-34.

According to the declaration of station manager Mr. Washington, he, Tameka Williams (a human-resources representative), and Ms. Pace investigated the incident. (Washington Decl., Rec. Doc. 50-6, at 3). Each of Ms. Stevenson, Ms. Singleton, and Ms. Louding submitted written statements about the incident. Id. Ms. Stevenson requested that Ms. Singleton obtain a witness

statement from Noel Smith, and one was obtained from him as well. (Id.; Stevenson Depo., Rec. Doc. 50-3, at 35). According to Mr. Washington, at the conclusion of the investigation, they determined that Ms. Stevenson should be removed from the Red Coat position because her conduct was inconsistent with the Red Coat duties of conflict resolution and maintaining composure during tense or irate situations. (Washington Decl., Rec. Doc. 50-6, at 3). Mr. Washington and other Performance Leaders met with Ms. Stevenson on March 2, 2013, to provide the Corrective Action Notice notifying Ms. Stevenson of her demotion. (Id.; Corrective Action Notice, Rec. Doc. 50-4, at 74). Mr. Washington testified that Ronnie Delaune and Debbie Lively Davis, Caucasians who were also Red Coats, were taken out of their lead positions due to conduct. (Washington Depo., Rec. Doc. 50-4, at 7). Mr. Delaune was using profanity with one of the agents. Id. at 8. Ms. Davis used an inappropriate gesture with another employee. Id.

In her statement of material facts, Ms. Stevenson disputes that she was terminated as a result of the altercation. As support, she cites her own deposition testimony describing the incident, which is summarized above. She also points out that Ms. Singleton did not identify who started the incident in her statement.

Meanwhile, on February 14, 2013, Ms. Stevenson emailed Ms. Singleton with a copy to Ms. Stevenson stating that:

> As a result of the recent stress I have been subjected to, I am experiencing painful symptoms that indicate to me that the condition of shingles that I experienced last year is returning. Therefore, I need to see my doctor in the morning. I wanted to let you know early so that you can provide proper staffing for tomorrow.

(Rec. Doc. 50-4, at 92). Ms. Stevenson contacted the Delta Employee Assistance Program, which referred her to therapist Mimi Jalanek. (Stevenson Depo., Rec. Doc. 50-3, at 56-57). Jalanek's records indicate that Ms. Stevenson visited her on February 14, 2013. (Jalanek Records, Rec. Doc. 50-11). Ms. Stevenson visited her physician, Dr. Steven Barnes, on February 18, 2013. (Stevenson

Depo., Rec. Doc. 50-3, at 60). Dr. Barnes prescribed Lyrica to treat shingles. Id. at 60-62. The medication caused drowsiness. Id. Dr. Barnes also filled out an Attending Physician's Statement of Disability form marking Ms. Stevenson as totally disabled from February 18, 2013 through February 20, 2013, with a return to work date of February 20, 2013. Id. Notes in Delta's file indicate that on February 19, 2013, Ms. Singleton contacted Ms. Stevenson to ask how she was feeling and to inform her that she needed to contact Sedgwick because it was her fifth day absent from work. (Rec. Doc. 50-4, at 75).

On February 20, 2013, Ms. Stevenson reported to Ms. Jalanek that she "felt 'drugged' from Lyrica." (Jalenek Records. Rec. Doc. 50-11, at 6). Sedgwick's records indicate that on February 21, 2013, Ms. Stevenson reported that the Lyrica was "making her severely tired so she is not able to work." (Stevenson Depo., Rec. Doc. 50-3, at 65). Delta's notes indicate that Mr. Washington spoke with Ms. Stevenson on February 22, 2013, at which time Ms. Stevenson advised that she was not feeling well and would not be at work on February 23, 2013. (Rec. Doc. 50-6, at 110). Mr. Washington advised Ms. Stevenson that she must contact Sedgwick to have her medical leave approved. Id.

Ms. Stevenson treated with Dr. Mirza Baig for shingles on February 22, 2013. (Stevenson Depo., Rec. Doc. 50-3, 66-68). Dr. Baig increased Ms. Stevenson's dosage of Lyrica. Id. Dr. Baig filled out an Attending Physician's Statement of Disability providing a return to work date of March 6, 2013. (Rec. Doc. 50-4, at 104-05). On March 4, 2013 (two days after she received notice of her demotion), Ms. Stevenson wrote an email to Mr. Washington asking what date she needed to be back at work to avoid job abandonment. (Rec. Doc. 50-4, at 82). Mr. Washington responded that "[y]our return to work date is contingent on what Sedgwick has pending or approved." Id. In a follow up email, Mr. Washington urged Ms. Stevenson to "give Sedgwick and your doctor a call

explaining your concerns on your condition" and offered to discuss with her further over the phone. Id. at 81.

Ms. Stevenson returned to work on March 6, 2013.[5] On March 14, 2013, Sedgwick notified Ms. Stevenson by letter that her short term disability claim for the period of February 15, 2013 through March 5, 2013, had been approved. Id. at 79-80.

On March 13, 2013, Ms. Stevenson returned to Dr. Baig. Id. at 83-84. The medical records from that visit note that Ms. Stevenson was on Neurontin and reported feeling drowsy on the job. (Ochsner Records, Rec. Doc. 50-14, at 12). Dr. Baig noted "[s]he had multiple office visits asking for excuse from work." Id. Dr. Baig advised Ms. Stevenson that he could not "give excuse for 1 month for medication. She need[s] to see a neurologist for the follow up and excuse. She verbalized understanding. I have her excuse from 3/13-3/17 until she finds neurology." Id. at 13. On March 18, 2013, Dr. Barnes wrote a note excusing Ms. Stevenson from work for thirty days because "patient is on a medication which may cause drowsiness." (Stevenson Depo., Rec. Doc. 50-3, at 87; Depo. Ex. 26, Rec. Doc. 50-4, at 112.) Nonetheless, Ms. Stevenson went to work on March 24, 2013. (Stevenson Depo., Rec. Doc. 50-3, at 88).

On April 15, 2013, Ms. Stevenson went to see neurologist Dr. Enrique Segura. Id. Dr. Segura filled out an Attending Physician's Statement of Disability that provided May 8, 2013, as Ms. Stevenson's return to work date. (Stevenson Depo. Ex. 27, Rec. Doc. 50-4, at 115). On May 10, 2013, Ms. Stevenson emailed Ms. Singleton, Mr. Cristina, and Mr. Washington, stating that she had followed up with her doctor who recommended that she remain on the prescription drug for another couple of months to stabilize her condition. (Stevenson Depo., Rec. Doc. 50-3, at 92;

---

[5] She claims she was sent home by Gary Anderson because her symptoms were too bad and she was scratching her face. (Stevenson Depo., Rec. Doc. 50-3, at 43). She admits that she returned to work and completed the remainder of the work week. Id. at 75. Ms. Stevenson does not assert a claim relating to this partial day.

Stevenson Depo. Ex. 28, Rec. Doc. 50-4, at 113). She reported that she had been in contact with Sedgwick. Id.

In a letter dated May 21, 2013, Sedgwick denied Ms. Stevenson's claim for short-term disability for the period after March 13, 2013. (Stevenson Depo., Rec. Doc. 50-3, at 94). Ms. Stevenson appealed the decision. Id.

On May 24, 2013, Dr. Segura issued a letter stating that Ms. Stevenson had been under his care since March 2013 for treatment of neuralgia. He noted that Ms. Stevenson's condition had improved with use of Lyrica, but "this medication can cause drowsiness." (Stevenson Depo Ex. 31, Rec. Doc. 50-4, at 125). He added that "Ms. Stevenson has informed me she won't be able to return to work while on this medication. Most, if not all, of the potential treatments for this condition will have the same side effect profile." Id. Finally, he stated "Please excuse [Ms.] Stevenson until her status is re-evaluated on her next visit July 8th 2018." Id. Ms. Stevenson provided this excuse to Sedgwick. (Stevenson Depo., Rec. Doc. 50-3, at 95). On June 6, 2013, Ms. Stevenson emailed Ms. Singleton and Mr. Cristina stating "I just want to reconfirm that per my doctor's orders and our conference call on last week, I will not be returning to work until after July 8." Id. at 97. She referenced Dr. Segura's note and stated "I have been instructed that I cannot return to work prior to my doctor releasing me to return." Id. at 98. She added "Thank you so much for being patient during my healing process, I look forward to returning soon." Id. at 98-99.

Meanwhile, while on her leave of absence from Delta, Ms. Stevenson applied to U.S. Airways for a flight attendant position. She became employed by U.S. Airways on or about May 30, 2013. (American Airlines Records, Rec. Doc. 50-15, at 3). She testified that when she wrote to her supervisors on June 6, 2013, that she looked forward to returning soon, she did not intend to return if she passed her four-week training at U.S. Airways. (Stevenson Depo., Rec. Doc. 50-3,

at 99-100). On June 19, 2013, she passed her training with U.S. Airways. Id. On the same day, she submitted a voluntary resignation to Delta. Id. at 99-100.

Ms. Stevenson testified that her discrimination claim "is strictly based upon the fact that [she] was told that I could not be at work on my medication when two people that I know of were on stronger medications than I was on and permitted to work." Id. at 101. Ms. Stevenson testified that she knew of an African-American employee who was also told they could not be at work while taking medication. (Stevenson Depo., Rec. Doc. 55-2, at 3). She testified that a white employee confided in her that he was taking 10 or 15 opioids a day, and that "they would grant him—he would come back with doctors' notes, they would let him take 15 minute breaks . . . ." (Stevenson Depo., Rec. Doc. 55-3, at 27). She testified that another employee "took medication and they just let [her] work on her medication and it wasn't a problem." Id. Ms. Stevenson did not explain whether this employee provided doctor's notes or even whether Delta was aware of the medication. Ms. Stevenson also testified that she believed that "race had something to do with those scenarios" when her supervisors pulled her into the office. Id. at 7.

### b. Race Discrimination Claim

"In employment discrimination cases, a plaintiff may present his case by direct or circumstantial evidence, or both." Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 896 (5th Cir. 2002). "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." Id. at 897. "If the plaintiff produces direct evidence that discriminatory animus played a role in the decision at issue, the burden of persuasion shifts to the defendant, who must prove that it would have taken the same action regardless of discriminatory animus." Id. at 896. If the plaintiff relies on circumstantial evidence of discrimination, then the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973),

applies. Id. Under that framework, the plaintiff must first establish a *prima facie* case of discrimination. Russell v. McKinney Hosp. Venture, 235 F.3d 219, 222 (5th Cir. 2000).

Of course, in Title VII cases, the prima facie case will vary depending on the circumstances. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 n. 6 (1981). For example, in a disparate treatment case, "to establish a prima facie case of discrimination on the basis of race or national origin, a plaintiff must show he or she was: (1) a member of a protected class; (2) qualified for the position held; (3) subject to an adverse employment action; and (4) treated differently from others similarly situated." Abarca v. Metro. Transit Auth., 404 F.3d 938, 941 (5th Cir. 2005). If the plaintiff establishes a prima facie case of discrimination, "the employer must respond with a legitimate, nondiscriminatory reason for its decision." Russel, 235 F.4d at 222. "This burden on the employer is only one of production, not persuasion, involving no credibility assessments." Id. "If the defendant meets its burden, the presumption of discrimination created by the prima facie case disappears, and the plaintiff is left with the ultimate burden of proving discrimination." Sandstad, 309 F.3d at 897. "The plaintiff, who always has the ultimate burden, must then 'produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination.'" Outley v. Luke & Assocs., Inc., 840 F.3d 212, 216 (5th Cir. 2016) (quoting Burton v. Freescale Semiconductor, Inc., 798 F.3d 222, 233 (5th Cir. 2015)).

Here, Delta argues that Ms. Stevenson's race discrimination claim fails because she cannot establish that an adverse employment action was taken because of her race. In opposition to the Motion for Summary Judgment, Ms. Stevenson does not appear to contest this argument, focusing entirely on her claim that she experienced a hostile work environment that led to her constructive discharge. Nonetheless, the court considers whether Ms. Stevenson's race discrimination claim can survive summary judgment.

Ms. Stevenson testified that she was "possibly" discriminated against by Ms. Pace from 2007 to 2012 when Ms. Pace pulled her into the office about performance and disciplinary issues because Ms. Pace was white. Ms. Stevenson also testified that during 2007 to 2012, Ms. Singleton, who is African-American like Ms. Stevenson, and Mr. Cristina, who is white, pulled her into the office more than her white counterparts and that race "had something to do with" it. The court finds that getting pulled into the office to discuss performance or discipline, without more, does not qualify as an adverse employment action. "An employment action that 'does not affect job duties, compensation, or benefits' is not an adverse employment action under Title VII." Banks v. E. Baton Rouge Par. Sch. Bd., 320 F.3d 570, 575 (5th Cir. 2003). "In the context of a racial discrimination claim, adverse employment actions involve 'ultimate employment decisions' such as hiring, firing, demoting, promoting, granting leave, and compensating." Stone v. Louisiana Dep't of Revenue, 590 F. App'x 332, 339 (5th Cir. 2014). Moreover, Ms. Stevenson's own testimony that she was "possibly" discriminated against reflects her uncertainty that race discrimination occurred.

Ms. Stevenson may be arguing that she was discriminated against when she was demoted from her position as a Red Coat in March 2013. Delta points out that Ms. Stevenson was partially demoted by Mr. Washington and Ms. Williams, who are both of the same race as Ms. Stevenson. Moreover, Ms. Stevenson has presented no evidence that other similarly situated employees were treated differently. Citing Mr. Washington's uncontroverted deposition testimony, Delta points out that Ms. Stevenson's demotion was consistent with previous demotions of Red Coat employees who were not the same race as Ms. Stevenson. (Washington Depo., Rec. Doc. 50-5, at 7-9). With evidence that two white employees were also demoted for inappropriate conduct (using profanity

with one of the agents and using an inappropriate hand gesture) and no evidence to the contrary, Ms. Stevenson cannot show that she suffered disparate treatment on account of race.

Ms. Stevenson also testified that Mr. Washington discriminated against her in 2013 when he notified her that she could not return to work while she was on medication that made her drowsy. She asserts this is different from Ms. Washington's treatment of two of her Caucasian colleagues. The court notes that Ms. Stevenson did not plead this claim in her complaint. In any case, the court finds this theory cannot survive summary judgment. To qualify as a "comparator" who was treated differently, the plaintiff must "demonstrate that the employment actions at issue were taken 'under nearly identical circumstances.'" Lee v. Kansas City S. Ry. Co., 574 F.3d 253, 260 (5th Cir. 2009). For example, "[t]he employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." Id.

Ms. Stevenson cites her own testimony that one employee confided in her that he was on 10 or 15 opioids a day, and that he came back with doctors' notes and Delta would allow him to take 15 minute breaks. (Stevenson Depo., Rec. Doc. 50-3, at 27). Ms. Stevenson also cites her own testimony that another employee took medication and was allowed to work. Id. She has not corroborated these stories with any evidence from the employees or Delta's records. She has not shown how these employees were similarly situated to her in their job responsibilities and supervisors. Moreover, the alleged experiences of these two individuals is not similar to Ms. Stevenson's experience. It appears that in the case of the first employee, a doctors' note stating an ability to work was provided, while here, Ms. Stevenson's doctor's notes excused her from work due to drowsiness from medication. As to the second employee, there is no indication what kind

of doctor's note was provided, if any. Nor does Ms. Stevenson's testimony indicate whether Delta was aware of the medication the second employee was taking.

Further, even if Ms. Stevenson's testimony that two employees were allowed to return to work while on strong medication could create an issue of fact as to whether she experienced disparate treatment, there is no evidence to support finding any adverse employment action because there is no evidence that Delta prevented Ms. Stevenson from returning to work as Ms. Stevenson claims. As Delta points out, the record demonstrates that Ms. Stevenson obtained multiple excuses from her doctors stating that she was unable to work due to her shingles condition from February 2013 to May 2013. When she had a note with a return to work date of March 6, 2013, she returned to work on that date and completed the remainder of the work week. When she met with Dr. Baig on March 13, 2013, she reported feeling drowsy on the job. Dr. Baig's notes reflect that Dr. Baig could not give a one-month excuse for medication and instead gave her an excuse from March 13 through March 17 while she found a neurologist. On March 18, 2013, Dr. Barnes excused Ms. Stevenson from work for 30 days because of drowsiness for medication. The evidence shows that Ms. Stevenson pursued and obtained notes excusing her from work and that Delta excused her from work as a result. There is simply no evidence to support Ms. Stevenson's contention that she was prevented from returning to work. It appears Ms. Stevenson may be relying on a June 6, 2013 email (written at a time when she was already employed by U.S. Airways), where Ms. Stevenson stated that "per My doctors orders and our conference call on last week, I will not be returning to work until after July 8th. My doctor has faxed over my work excuse to you all and I have been instructed that I cannot return to work prior to my doctor releasing me to return." This email is consistent with the evidence that Ms. Stevenson obtained doctor's notes

excusing her from work and that as a result of the notes, she was excused. It does not indicate that Ms. Stevenson was attempting to return to work, nor that Delta was preventing it.

The court can find no evidence from which a reasonable jury could conclude that Ms. Stevenson suffered an adverse employment action because of her race. Ms. Stevenson's race discrimination claim could not survive summary judgment.

### c. *Disability Discrimination Claim*

Ms. Stevenson's claim for disability discrimination under the ADA is subject to the same burden shifting framework discussed above for race discrimination claims under Title VII. See Cardiel v. Apache Corp., 559 F. App'x 284, 288 (5th Cir. 2014). "In order to prove a prima facie case of disability discrimination, plaintiff must prove that he suffered an adverse employment action at the hands" of his employer. Osborne v. Elmer, 328 F. Supp. 2d 620, 625 (M.D. La. 2004). As above, only ultimate employment decisions like hiring, firing, discharging, or promoting meet the standard of an adverse employment action. Id. The plaintiff must also show that she was treated less favorably than other similarly situated individuals who were not members of the protected class, under nearly identical circumstances. Paske v. Fitzgerald, 785 F.3d 977, 985 (5th Cir. 2015); see Hoffman v. Baylor Health Care Sys., 597 F. App'x 231, 235 (5th Cir. 2015) (applying the same standard in an ADA discrimination case).

Delta argues that Ms. Stevenson's disability discrimination claim fails as a matter of law because she did not suffer an adverse employment action because of a disability and was not treated less favorably than a nearly identical comparator. As noted above, Ms. Stevenson's opposition to Delta's motion for summary judgment addresses only her hostile work environment/constructive discharge claim. In fact, her memorandum in opposition does not refer to disability discrimination

at all. Nonetheless, the court considers whether her ADA discrimination claim can survive summary judgment.

First, the court finds that Ms. Stevenson has not shown any adverse employment action because of her disability. The only allegation that might be construed as an alleged action by Delta related to Ms. Stevenson's shingles condition is Delta's alleged refusal to allow her to return to work on medication. But as discussed in detail above, there is no evidence that Delta did not permit Ms. Stevenson to return to work on medication. In fact, Delta did allow her to return to work on March 6, 2018, when her work excuse expired. The evidence shows that Ms. Stevenson obtained multiple work excuses and that Delta simply honored them. Ms. Stevenson cannot show an adverse employment action. Further, Ms. Stevenson has not shown that similarly situated individuals were treated differently. For the same reasons that the court has found that Ms. Stevenson has not identified a nearly identical comparator for her Title VII claim for race discrimination arising out of the alleged refusal to allow her to return to work while on medication, the court now finds she has not identified a nearly identical comparator for purposes of her ADA claim. Ms. Stevenson's ADA discrimination claim could not survive summary judgment.

### d. *Hostile Work Environment Claim*

As noted above, the only arguments raised by Ms. Stevenson in opposition to Delta's motion for summary judgment were to argue that she experienced a hostile work environment and that she was constructively discharged. It is unclear whether Ms. Stevenson is attempting to assert a separate claim for a hostile work environment, or whether she is simply arguing that an allegedly hostile work environment compelled her to resign. To the extent she seeks to assert a hostile work environment claim, as Delta points out, Ms. Stevenson's hostile work environment claim was dismissed by the District Court for the District of Columbia on May 5, 2016.

*e. Constructive Discharge Claim*

To establish a constructive discharge claim, the employee must show that "working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign." Perret v. Nationwide Mut. Ins. Co., 770 F.3d 336, 338 (5th Cir. 2014) (quoting Aryain v. Wal-Mart Stores Texas LP, 534 F.3d 473, 480 (5th Cir. 2008)) (alteration in original). The Fifth Circuit considers the following factors in determining whether the employer's actions reach this level:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer were accepted or not.

Perret v. Nationwide Mut. Ins. Co., 770 F.3d 336, 338 (5th Cir. 2014).

In opposing Delta's motion for summary judgment, Ms. Stevenson cites the following facts in dispute. She asserts that she was prohibited from returning to work while on medication, when two white employees were permitted to return to work on strong medication.[6] Ms. Stevenson cites her own testimony that an unidentified African-American employee was told they could not be at work while taking medication. She cites her own testimony that a Caucasian employee was allowed to do whatever she wanted and that "everybody knew this young lady had a drug problem and was stealing from the company." (Stevenson Depo., Rec. Doc. 50-3, at 23-24). She does not provide any specific examples or evidence to support this testimony. Ms. Stevenson cites her testimony that "there were a lot of race issues that I saw within Delta even before it got to a terrible

---

[6] As discussed above, the minimal evidence Ms. Stevenson cites to support this proposition does not actually support her theory. The evidence does not show that Ms. Stevenson was prohibited from returning to work, but instead shows that Ms. Stevenson obtained doctor's notes excusing her from work and that she was excused from work in accordance with the notes. Moreover, her own testimony does not even tend to show that the other employees who were allegedly allowed to work on medication also had doctor's notes excusing them from work.

point for me" and that she thought "there were a lot of things that people that were other than black would get away with, but if you attempted anything near it, you would get in trouble for it . . . . So ultimately yes, I think race played a factor in that establishment. Id. at 24, 26. Other than medication use and the individual who had a drug problem, Ms. Stevenson does not provide any examples of the "things" she was referring to in her testimony. She says she was treated more harshly than other employees due to her race, citing her testimony that she was pulled into the office and she believed race had something to do with it. Id. at 25-26. She cites the altercation with co-workers on December 26, 2010, and her statement in an email to Delta at that time that she felt she was constantly under attack and that some individuals might be conspiring against her. She cites her December 29, 2010, email to Pace describing the incident where her supervisor, Mr. Cristina, stood behind her while she was typing an email and stated that "this has to stop" and that she could not "go around threatening people." In that email to Pace, Ms. Stevenson stated that she felt threatened and intimidated by Mr. Cristina's actions, though as noted above, she did not state she felt this was racially motivated. Ms. Stevenson cites the email from her Caucasian supervisor in response to a report of inappropriate behavior by a Caucasian employee that Ms. Stevenson was "a leader" and that she should advise the employee that she wanted to speak to him professionally and to tell him how the incident made her feel. With regard to her demotion for the February 10, 2013, altercation with another employee, Ms. Stevenson points out that Singleton's statement did not identify who started the incident.

As a matter of law, even interpreting the above allegations in the light most favorable to Ms. Stevenson, no reasonable jury could find that Ms. Stevenson was subjected to working conditions that were so terrible that she was compelled to resign. Of the factors to be considered in assessing whether a plaintiff can prove a constructive discharge claim, the only factors present

are a demotion and reduction in job responsibilities. As discussed above in the court's assessment of Ms. Stevenson's race discrimination claim, Ms. Stevenson cannot show that her demotion was racially motivated. There is no evidence here of badgering, harassment, or humiliation intended to encourage resignation. In fact, there is no dispute that in the months leading up to her resignation, Ms. Stevenson was on medical leave. The December 2010 incidents do not rise to the level of intolerable and, moreover, occurred years before Ms. Stevenson's resignation. Further, a reasonable person would not feel compelled to resign as a result of the single altercation in 2013 and the resulting demotion, which, as discussed above, has not been shown to be motivated by race. Importantly, there is no dispute that Ms. Stevenson resigned to begin working for U.S. Airways. Ms. Stevenson's claim for constructive discharge could not survive summary judgment.

## Conclusion

Because Ms. Stevenson has failed to meet the standard for granting a motion for reconsideration and because, in any event, her claim would not have survived summary judgment, Ms. Stevenson's Motion for Reconsideration (Rec. Doc. 62) is DENIED and Delta's Motion to Strike (Rec. Doc. 65) is DENIED as moot.

New Orleans, Louisiana, this 25th day of June, 2019.

Janis van Meerveld<br>
United States Magistrate Judge